Ruffix, C. J.
 

 The legislature has wisely set its face against the idle and vicious practice of gaming ; and to that end has passed various laws, calculated more or less to suppress it. But no one of them, we believe, reaches the present case. Besides avoidingal] securities for money won at play, certain kinds of gaming are made criminal. Playing at cards in a public house, and betting thereon, and suffering such gaming at cards by the keeper of the house,or supplying the players with refreshments, are forbidden and distinctly made' indictable. Against public gaming tables also there are several provisions. E. O., A. B., and A. B. C., faro banks, pass die tables, or any other table or bank of the same or like kind under any denomination, are forbidden to be used in this State, and heavy penalties given against any one, who keeps or uses them or who suffers games to be played at them in his house; and authority is given to certain offi.-
 
 *273
 
 cers to destroy the tables, and seize all money staked or exhibited.
 
 Rev. Stat.
 
 c. 34, s. 64, &c. None of those enactments sustain this indiement. Except as to gaming at cards, forfeitures and pecuniary penalties alone are enacted; and not indictment. To supply that omission the legislature passed the act of 1835, which is incorporated into the present statute.
 
 Rev. St.
 
 c- 34, s. 68. It is the only provision bn which reliance is placed in support of this indictment, and is, no doubt, the one on which the'indictment was drawn. It enacts that, in addition to the penalties before prescribed, any person, who shall construct, erect, keep up, or use any public gaming table or place, at which games of chance shall be played, by whatever name called, and every person, who shall play at any of the forbidden gaming tables any game of chance and bet thereon, shall be guilty of a misdemeanor, and upon indictment and conviction shall be punished as prescribed by the Act. The question, then, is the narrow one, whether
 
 “
 
 ten pins,” as it is described in the exception, is a game of chance, or not. The phrase, “ game of chance,” is not one long known in the law and having therein a settled signification, but was introduced into our statute book by the act of 1835. As it had no technical meaning, as a legal expression, it must have been used by the legisla, ture in the sense in which persons conversant in games, or the world at large, give to it in classing the different kinds of games. Therefore it is apparent, that those games are specified in contra-distinction to other games, which are not games of ehanee. In other words, those terms must be understood in their plain, popular sense, as descriptive of a certain kind of games of chance in contra-distinction to a certain other kind, commonly known as games of skill. Though our knowledge on such subjects is very limited, yet we believe, that, in the popular mind, the universal acceptation of “ a game of chance” is such a game, as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or
 
 *274
 
 adroitness hav® honestly no office at all, or are thwarted by chance. As intelligible examples, the games with dice» which are determined by throwing only, and those, in which the throw of the dice regulates the play, or the hand at cards depends upon a dealing with the face down, exhibit the too classes of games of chance. A game of skill, on the other hand, is one, in which nothing is left to chance ; but superior knowledge and attention, or superior Strength, agility, and practice, gain the victory. Of this kind of games chess, draughts or chequers, billiards, fives, bowles, and quoits may be cited as examples. It is true, that in these latter instances superiority of skill is not always successful — the race is not necessarily to the swift. Sometimes an oversight, to which the most skilful is subject, gives an adversary the advantage ; or an-unexpected puff of wind, or an unseen gravel in the way, may turn aside a quoit or a ball and make it come short of the aim. But if those incidents were sufficient to make the games, in which they may occur, games of chance,, there would be none other but games of that character. But that is not the meaning of the statute ; for, as before remarked, by the very use of those terms, the existence of other kinds of games, not of chance, is recognised. The incidents mentioned, whereby the more skilful may yet be the loser, are not inherent in the nature of the games. Inattention is the party’s fault, and not his luck ; and the other obstacles, though not perceived nor anticipated, are occurrences in the course of nature and not chances. They are, indeed, sometimes inaccurately called so, as one hears “ chances of war” used to excuse losses by means not foreseen, but which might, and, though out of the usual course' of things, ought to have been foreseen, and provided against. For the art of war is surely a science, and the results of certain powers, movements, and combinations may be almost mathematically calculated. In the same manner comparing small things with great, these are games of skill — purely such
 
 *275
 
 although the better player may, in particular instances, fail to win, from such causes as those mentioned, the want of attention or energy, and not the blindness of chance. In that sense ten pins, as understood by us from the description in the case, is not a game of chance, but of skill. Nothing is referred to chance; but, as in billiards, a just estimate of distances and angles, steadines of hand, and a due application of strength constitute, under ordinary circumstances, the judicious and successful player. We take this game to be one species of the game known in England, and' spoken of in her statutes, under the general term of
 
 Bowls;
 
 and if it be, there is legal authority for holding it not to be a game of chance. The phrase is found in a statute of 5th
 
 Geo.
 
 4, which enacts, that every person playing or betting, in any open or public place, at or with any table or instrument of gaming, “ at any game, or pretended game of chance/!' may be punished as a vagrant. Mr. Chitty states that playing at bowls is not within the act,
 
 3 Chit. Cr. L.
 
 673. So in
 
 Sigel
 
 v.
 
 Jebb, 3
 
 Stark. C. 1. Chief Justice Abbott held, that all games for money, “ whether of skill or of chance,” were unlawful within the meaning of
 
 St.
 
 9,
 
 Ann.
 
 and remarked particularly, that playing at bowls had been held to be within that statute, “ and yet that was not a game of chance,” In like manner bowls and ten pins are certainly within our act avoiding gaming contracts. But, for the reasons assigned, we do not think that those, and other games of the like kind, are games of chance, within the other act of 1835, so as to render the players indictable.
 

 Per Curiam.
 
 Judgment
 
 reversed, and
 
 venire de novo.